IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| JANET KRAVIS | : | CIVIL ACTION |
| --- | --- | --- |
| v. | : | No. 09-485 |
| KARR BARTH ASSOCIATES, et al. | : | |

## MEMORANDUM

**Juan R. Sánchez, J.**                                                                                    January 26, 2010

      Defendants Karr Barth Associates and AXA ask this court for summary judgment on Plaintiff Janet Kravis's claim she suffered employment discrimination, retaliation, and harassment as an employee of Karr Barth and AXA. For the following reasons, this Court will grant Defendants' Motion for Summary Judgment.

**FACTS**

      Kravis alleges Karr Barth and AXA (Defendants) discriminated against her based on her age and gender, in violation of Title VII of the Civil Rights Act of 1964 (Title VII),[1] 42 U.S.C. §2000e *et seq.*, the Age Discrimination in Employment Act (ADEA),[2] 29 U.S.C. § 621 *et seq.*,

---

[1] Under Title VII, "[i]t shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a).

[2] Under the ADEA, "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a).

and the Pennsylvania Human Relations Act (PHRA),[3] 43 P.S. § 951 *et seq*. Additionally, Kravis alleges she was subjected to a hostile work environment and was retaliated against for filing internal complaints of harassment and a discrimination complaint with the EEOC.

Kravis began working for The Equitable Life Assurance Society in 1987.[4] In 1990, upon being promoted to the position of Sales Agent, Kravis executed an Agent's Agreement, or 14th Edition Agreement ("Agreement"). This Agreement superseded her prior 12th Edition Agreement with The Equitable. The significance of the 14th Edition Agreement is contested by the parties and is the primary subject of this motion for summary judgment. The Agreement Kravis signed changed her status from a salaried employee earning 50% of her paycheck though commissions to a "Sales Agent" compensated solely through sales commissions. Kravis contends this Agreement created an employer-employee relationship with AXA; AXA counters such a relationship is precluded by the plain language of the contract.[5]

---

[3] Under the PHRA:

> [i]t shall be an unlawful discriminatory practice . . . for any employer because of the . . . age, sex . . . of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is best able and most competent to perform the services required.

43 P.S. § 955(a).

[4] AXA Network is the successor-in-interest to The Equitable.

[5] This Agreement contains the clause, "Independent Contractor: Nothing contained herein shall be construed to create the relationship of employer and employee between [AXA Network] and the Agent."Agent's Agreement, ¶ XVI

At the time this motion was filed, Kravis was still acting as a Sales Agent for Defendants. To become an AXA Sales Agent, Kravis had passed state life insurance and health insurance regulatory exams and obtained licenses to work in the insurance field. Pl.'s Dep. 13:24-15:12, Aug. 5, 2009.[6] She is required to maintain those licenses by attending classes and taking regular exams. Pl.'s Dep. 17-18. Kravis is registered as a life insurance salesperson in approximately 15-18 states, and is a registered investment advisor in 12 states. Pl.'s Dep. 22-24.

Kravis must supply her own car and is required to pay for her office computers and telephones. *Id.* at 66-67. She deducts these business expenses from her tax returns.[7] *Id.* at 46-47. From 2002 to 2005, Kravis attached a Schedule C sole proprietorship form to her tax return. She indicated her principal business was as an Insurance Agent and she materially participated in the operation of this business. *See* Kravis Tax Returns 2002-2005. As a Sales Agent, Kravis regularly hires administrative assistants to help her and does not need Defendants' permission to hire or fire her secretarial support. Kravis alone is responsible for paying her employees, evaluating employee performance, and approving employees' vacation time. Pl.'s Dep. 78-79.

Kravis runs her daily business operations without interference from AXA or Karr Barth. Kravis primarily works out of an office in Bala Cynwyd, Pennsylvania, which she rents from Karr Barth for approximately $1750 a month.[8] Pl.'s Dep. 49-50. Kravis also has a home office,

---

[6] The Court provides extensive citations to Plaintiff's deposition because, in Kravis's response to the instant motion for summary judgment, she contends there are disputed issues of material fact regarding the conditions of her relationship with Defendants. However, Kravis's deposition testimony conclusively establishes there is no genuine dispute between the parties as to such issues.

[7] On Kravis's 2002-2005 tax returns she took deductions for office and advertising expenses, car and truck expenses, and costs of business gifts, clerical and administrative support, client-related seminars, continuing education, dues and publications, licenses, marketing and sales proposals, postage and telephone. *See* Kravis Tax Returns 2002, 2003, 2004, 2005.

[8] Kravis estimates she pays approximately $21,000 a year in rental fees to Karr Barth.

and she may choose from which office to work on a daily basis. *Id.* at 70. No one from Karr Barth or AXA dictates what hours Kravis must be in her office, how much time she must work each week, how many sales she is required to make, or how much vacation time she may take. *Id.* at 49. She creates her own sales targets and sets her own sales goals for each year, without Karr Barth managers' interference. *Id.* at 108. Kravis testified she has minimal daily contact with Karr Barth's branch manager, who she typically sees twice a month. *Id.* at 99. Kravis finds her clients through referrals and seminars, and she is not required by Defendants to take on any specific clients. *Id.* at 88-89. Through Kravis's sales agent activity, she has generated a book of business which she is permitted to sell to other potential sales agents. *Id.* at 71, 279-281.

Kravis filed this action following a dispute with Paul Bufty, another Sales Agent in Karr Barth's Philadelphia Office. In 2006, Kravis voluntarily partnered with Bufty to pursue insurance sales with City of Philadelphia employees. This working relationship rapidly deteriorated, and Kravis ended her partnership with Bufty. Kravis contends Bufty wrongfully hired away her secretary, Patti D'Orazio, while Kravis and Bufty were competing for the city's business. When Kravis complained to Karr Barth's management about Bufty hiring D'Orazio, Defendants advised Kravis that Bufty could not be fired or formally reprimanded for hiring Kravis's secretary, since both Kravis and Bufty were independent Sales Agents who exercised exclusive discretion over which employees to hire and fire.[9] When D'Orazio accepted employment with Bufty, Defendants supplied Kravis with temporary support for one week. After a week of temporary support, Kravis worked on her own until she hired a new secretary.

---

[9] Kravis concedes Bufty did not need her permission to hire D'Orazio, and D'Orazio was free to quit at any time. Kravis email, April 29, 2007. Kravis describes the practice of refraining from hiring assistants from a co-worker as "a professional courtesy that exists. It's almost unsaid." Pl.'s Dep. 155.

4

In support of her harassment claim, Kravis points to a series of isolated encounters with male co-workers which she believes created a hostile work environment. These include a fight over a parking space, a dispute over the use of a conference room, and an encounter with Bufty when he yelled at Kravis that she was a "nothing and a nobody" in the hallway of their office space. Kravis contends she was denied equal conditions of employment when her secretary was not given adequate office space, Kravis was denied prompt access to the Client Relations Management Program (CRM Program), and Kravis received inferior sales leads when she was eventually admitted to the CRM Program.

Kravis complained about her interactions with Bufty to Karr Barth Management. Karr Barth investigated her complaints and received conflicting information regarding whether Bufty or Kravis was at fault. David Karr testified, "[T]here was a period of time when both of them were complaining constantly about one another." Karr Dep. Sept. 28, 2009 at 29. Ultimately, Defendants were unable to corroborate Kravis's account of her conflicts with male employees. With regard to Kravis's relationship with Bufty, Defendants concluded both Bufty and Kravis had acted unprofessionally toward each other.[10] To resolve the issue, Defendants sent letters to both Kravis and Bufty reminding them to maintain professionalism in the office and asked Bufty to avoid Kravis when possible.

---

[10] Defendants include an email exchange between Bufty and Kravis where Bufty told her she was a "great lady" and he wished to work with her, but that she made working together difficult because she spoke to him condescendingly and acted like a "lone ranger." Bufty Email to Kravis, June 7, 2006. In response, Kravis told Bufty he needed to "grow up." Kravis Email to Bufty, June 8, 2006.

In these interactions, Bufty never mentioned Kravis's age or gender and Kravis testified at her deposition that Bufty was equally rude and abrasive to two male employees in their thirties.[11]

**DISCUSSION**

Summary judgment shall be awarded "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). On a motion for summary judgment, a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor. *Doe v. County of Centre*, 242 F.3d 437, 446 (3d Cir. 2001). Facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Ricci v. DeStefano*, 120 S. Ct. 2658, 2677 (2009) ( "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.").

The moving party "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The nonmoving party must then "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and

---

[11] Kravis referred to two male employees in their 30s named Mike and Dan, testifying they were "abused by [Bufty] to do a lot of very hard work…[v]erbally abused by him . . . he berated them, made them feel incompetent, made them feel that they were neglectful." Kravis. Depo. Tr. 136-37.

admissions on file' designate 'specific facts showing that there is a genuine issue for trial." *Id.* at 324.

Before turning to the merits of Kravis's claim, I must first resolve the threshold issue of whether Kravis is an employee of Defendants. If Kravis is merely an independent contractor, not an employee, Title VII and the ADEA cannot provide legal redress. *Brown v. J. Kaz, Inc.*, 581 F.3d 175 (3d Cir. 2009); *Kumar v. Temple Univ. Cancer Ctr.*, No. 95-7832, 1997 U.S. Dist. LEXIS 13576, at *17 (E.D. Pa. Aug. 29, 1997) ("[T]he protection of Title VII extends only to those who are 'employees' and does not extend to independent contractors."); 29 U.S.C. § 623(a); *see also E.E.O.C. v. Zippo Mfg. Co.*, 713 F.2d 32, 35 (3d Cir. 1983) (explaining the ADEA only covers employees, not independent contractors).

Whether a hired party qualifies as an "employee" for ADEA and Title VII purposes is a question of law for the Court in the absence of disputed material underlying facts. *See Cox v. Master Lock Co.*, 815 F. Supp. 844, 845 (E.D. Pa. 1993). In evaluating whether or not Kravis qualifies as an employee, the Court will first consider the intent of the parties, as evinced by the contract Kravis signed to become a Sales Agent with Defendants. Where parties have reduced their agreement to writing, courts may ascertain the parties' intent by examining the writing. *See Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 613 (3d Cir. 1995). A written agreement alone is not dispositive of a party's employment status, but it may serve as "strong evidence" Kravis was an independent contractor. *Holtzman v. World Book Co., Inc.*, 174 F. Supp. 2d 251, 256 (E. D. Pa. 2001) (cited with approval by *Brown*, 581 F.3d at 181) ; *see also Adcock v. Chrysler Corp.*, 166 F.3d 1290, 1293 (9th Cir. 1999) (stating contract language

"though not dispositive, reflects the parties' intention that [plaintiff] would have been an independent contractor, not an employee") (citations omitted).

Kravis entered into the Agreement with Defendants on January 6, 1990. Defs.' Ex. 2: Agent's Agreement. This Agreement superseded the prior agreement between Kravis and Defendants. Agent's Agreement ¶ XVII. The Agreement explicitly states it does not "create the relationship of employer and employee between [AXA Network] and the Agent." *Id.* ¶ XVI. The same provision of the contract establishes Kravis's independence in choosing clients and dictating her own working hours.[12] The Agreement also indicates that, although Kravis must comply with AXA's rules and regulations, "such rules and regulations shall not be construed so as to interfere with the freedom of action of the Agent." ¶ XVI. The terms of the Agreement establishes the clear intent of the parties was to establish Kravis as an independent contractor, not an employee, of Defendants.

Even if the agreement did not clearly identify Kravis's status, the terms and conditions of Kravis's employment show, in practice, Kravis worked as an independent contractor of Defendants.

The term "employee" is defined in Title VII as "an individual employed by an employer." 42 U.S.C. § 2000e(f); 43 P.S. § 954(b).[13] To determine whether a person is an employee for purposes of Title VII and the ADEA, the common law test of agency and the traditional master-

---

[12] The agreement reads, in relevant part, "The Agent shall be free to exercise independent judgment as to the person from whom applications for policies and annuity contracts will be solicited and the time and place of solicitation." *Id.* XVI.

[13] This definition is unhelpful when trying to differentiate an "employee" from an "independent contractor. *See Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 444 (2003) (describing the definition of "employee" in Title VII as "completely circular and explain[ing] nothing.").

8

servant doctrine apply. *Prather v. Prudential Fox & Roach*, 326 Fed. Appx. 670, 672 (3d Cir. 2009). Whether or not a hired party qualifies as an employee turns on "the hiring party's right to control the manner and means by which the product is accomplished." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992); *see also Walters v. Metro Educ. Enters.*, 519 U.S. 202, 211 (1997) (applying the *Darden* test to ascertain whether an individual is an employee within the meaning of Title VII and the ADEA). The factors relevant to this inquiry are:

> [T]he skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* at 323-24. No one of these factors is determinative. *See Ward*, 362 U.S. at 400.

The key inquiry under *Darden* is Defendants' right to control the manner and means by which Kravis accomplished her job. Application of the *Darden* factors to the undisputed facts of the instant case reveals the following: Kravis's job requires specialized skills and in-depth knowledge of the insurance and financial industries. She is responsible for maintaining her licenses to practice and for completing continuing education courses in the insurance field. Kravis supplies her own tools and instrumentalities for her occupation; she uses her own car and computer and pays for her own telephone equipment, marketing materials, and administrative support.

Defendants do not have the right to assign projects to Kravis, and she is free to accept or reject any client suggestions Defendants make. Kravis enjoys almost unlimited discretion over where and how long to work; she is free to choose where to have her office, how many hours to

9

work, and how many clients to pursue. The only behavior Defendants require from Kravis is her compliance with the detailed regulatory schemes impacting sellers of insurance and financial products.

Kravis has sole discretion over her vacation time. She may either work from Defendants' branch office or from home. Kravis chooses to maintain an office at Karr Barth's Philadelphia location and pays monthly rent for her office space. She is solely responsible for hiring and firing her own administrative support staff, without oversight or influence by Defendants. The Defendant's method of payment to Kravis is a percentage of her total sales; she is not paid a salary, but receives one hundred percent of her compensation from commissions on sales. Defendants also do not provide Kravis automatic benefits; instead, Kravis must meet certain criteria to become eligible to participate in group benefit programs.

The duration of the parties' relationship is almost 20 years. Although this lengthy duration would generally weigh in favor of finding Kravis is an "employee," both Kravis and Defendants retain the power to terminate the Agreement at any time, so long as the party provides 30 days written notice. *See, e.g., Anyan v. N.Y. Life Ins. Co.*, 192 F. Supp. 2d 228, 238-39 (S.D.N.Y. 2002) (finding the plaintiff insurance salesman's long-term relationship with the hiring party did not negate his independent contractor status in light of factors, including explicit contract terms, suggesting otherwise).

Kravis's IRS status as a "Full-Time Life Insurance Salesperson" does not negate her role as an independent contractor. Kravis qualifies as a Full-Time Life Insurance Salesperson under IRS rules because her principal business activity is selling life insurance. However, an IRS Revenue Ruling on this subject makes clear a full-time insurance salesman under the Internal

Revenue Code is a statutory creation and does not create an employee-employer relationship. Rev. Rul. 90-93, 1990-45 I.R.B. 4, 1990 WL 657107.  Kravis's tax returns further support her independent contractor status, since she filed a Schedule C sole proprietorship attachment to her tax return during the years in question.

Kravis's title, "Vice President of Karr Barth Associates," also does not negate her independent contractor status.  These titles are given out merely as marketing tools at Karr Barth but do not alter the contractual terms between an Agent and the company.[14]  Thus, I find this title did not create an employer-employee relationship between Kravis and Defendants, especially in light of the numerous factors suggesting no such relationship existed.

After evaluating the factors described in *Darden*, I conclude Kravis is an independent contractor, not an employee of Defendants.  Thus, Kravis's ADEA and Title VII claims fail. As an independent contractor, Kravis cannot avail herself of the protections of these statutes. Accordingly, the Court grants Defendants summary judgment on Kravis's Title VII and ADEA claims.

Because there are no remaining federal issues in this case, the Court declines to exercise supplemental jurisdiction over Kravis's state law PHRA claims and this claim is dismissed without prejudice.  An appropriate order follows.

---

[14] Defendants provide the requirements for using Karr Barth executive titles.  These criteria are based on performance levels as a sales associate, not on any underlying agreement between Defendants and the Agent.  Kravis's title, Vice President, requires a Sales Associate to perform at "Centurion" level for two consecutive years.  To continue to use this title after it is earned, an associate must meet a minimum production level of $40,000.  Kravis has no authority to bind Defendants to contracts and, as Kravis admitted, this title does not bring additional compensation or managerial responsibilities.  Def.'s Ex. 12; Pl.'s Dep. 37.